**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **VINCENT FORRAS,** *et al.*, | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 1:12-cv-00282-RWR** |
| | ) | **Judge Richard W. Roberts** |
| **v.** | ) | |
| | ) | |
| **IMAM FEISAL ABDUL RAUF, et al.,** | ) | |
| | ) | |
| **Defendants**. | ) | |
| | ) | |
| | ) | |
| | ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### INTRODUCTION

Defendants have continued to exhibit tireless efforts to punish Plaintiffs for attempting to vindicate their legally cognizable rights while they disingenuously hide behind the First Amendment to avoid the repercussions of Defendants' malicious, defamatory, and dangerous statements made against Plaintiffs. There is no doubt as to the importance of the First Amendment and its vital guarantee of free and uninhibited discussion of public issues. However, there is another side to the equation, one that sounds for Plaintiffs.

The Supreme Court has recognized the important social values, which underlie the law of defamation and have acknowledged that "society has a pervasive and strong interest in preventing and redressing attacks upon reputation. *Milkovich*, 497 U.S. 1, 22 (1990), *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966). After all, "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being – a concept at the root of any decent

system of ordered liberty." *Milkovich*, 497 U.S. at 22, citing *Rosenblatt*, 383 U.S. at 92-93 (concurring opinion).

To put it simply, the First Amendment was not intended to provide Defendants with a "free-pass" to publicize malicious defamatory statements that Plaintiffs were "enemies of Islam, among other statements that were so atrocious and egregious, that the statements signaled to radical Muslims to severely cause bodily harm to, or kill Plaintiffs. Defendants' malevolent intent in making the false statements further remove the protections of the First Amendment from Defendants' speech. Specifically, Defendants' speech was designed to provoke radical Muslims to injure or kill plaintiffs so that Plaintiffs could no longer pursue their lawsuit before the Supreme Court of New York to stop the construction of the Mosque near Ground Zero and to scare Plaintiffs and innocent third parties to deter them from challenging the actions of radical Muslims in New York City, the United States and around the world. In effect, the First Amendment was intended to allow for the public exchange of information in the marketplace of ideas, not to protect Defendants' actions, which constitute forms of psychological and actual terrorism.

As Defendants try to use the First Amendment as a shield, they mislead the court by presenting unfounded and baseless reasons for Plaintiffs' actions to be dismissed. All the while, they ignore the fact that it has come to light that Defendants, particularly Defendant Rauf, has been involved in criminal activity, using the Mosque at issue as the means to perpetrate his crimes. Despite his claim that he uses donations to "combat anti-Muslim sentiment," Rauf has instead defrauded donors to his nonprofit organizations by embezzling millions of dollars and using the money for personal real estate, lavish trips, and luxury sports cars. It would be

interesting to find out exactly how taking lavish trips and driving a luxury sports cars, while depriving his non-profit organization of funds, helps Rauf combat anti-Muslim sentiment.

However, Defendants criminal activity comes as know surprise nor does his desperate tactics to circumvent the laws. Despite Defendants contentions: (1) Plaintiffs have properly invoked diversity jurisdiction; (2) Personal Jurisdiction over Defendants exists under D.C.'s long-arm statute and the Due Process Clause of the U.S. Constitution; (3) Plaintiffs' claims are not barred by the statute of limitations as their complaint was timely filed and the applicability of the Doctrine of Equitable tolling; (4) Defendants' statements are not privileged under the "judicial proceeding" privilege, particularly since the statements were unrelated to the action and transcend all bounds of human decency; (5) Plaintiffs' claims are not barred by the D.C. Anti-SLAPP Act, because the Anti-SLAPP Act is inapplicable in federal court, the speech at issue does not fall within the ambits of the Act given the legislative intent and public policy concerns, and even if the Act applied, Plaintiffs have shown that they are likely to succeed on the merits of their claims; (6) Defendants' statements are not protected by the First Amendment; and (7) Plaintiffs' claims are not barred by the doctrines of res judicata and collateral estoppel. As such, Plaintiffs respectfully request that Defendants' Motion to Dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(1), (2) (3), & (6) and the D.C. Anti-SLAPP Act be denied.


## STATEMENT OF FACTS

Plaintiff, Vincent Forras (hereafter, "Forras"), was a supervisor First Responder during the 9/11 terrorist attacks on the Twin Towers in New York City and was responsible for rescuing several victims of all religious and races, including Muslims, who were injured during the attacks. Forras was forced to witness the death and destruction of his friends, family, and

countrymen. Subsequently, Forras brought an action in the Supreme Court of New York alleging

nuisance, intentional and negligent infliction of emotional distress, and assault caused by against

defendants in regard to what has become known as the Ground Zero Mosque ("GZ Mosque").

*Vincent Forras, on behalf of himself and all others of and in the City of New York, County of*

*New York, similarly situated v. Feisal Abdul Rauf and Cardobo* (Index No. 111970/2010)

(Hereafter "*Forras v. Rauf*").

The lawsuit focused on the defendants' continued efforts to build a Muslim Mosque near

Ground Zero, despite imposing a nuisance on Forras and the surrounding community. Compl. ¶3.

Defendants' actions and use of the property had substantially and unreasonably interfered with

the plaintiffs' normal and protected use of their property, and their personal and business use of

the area in and around Ground Zero. Compl. ¶3, 4. The legal action had nothing to do with an

attack on the Islamic faith; indeed both Plaintiff and his counsel engage in activities, personal

and professional, which seek to aid peaceful Muslim relations. Compl. ¶7.

Forras' foundation, Gearupfoundation.org, engages in such activities. Compl. ¶7.

Plaintiff's counsel, Larry Klayman (hereafter "Klayman"), not only claims as friends, on

Facebook and in daily life, hundreds of Muslims but also has pursued anti-discrimination legal

actions on their behalf. Compl. ¶7. Klayman represented Forras as counsel in the lawsuit. Compl.

¶3.  Klayman is an American citizen of Jewish origin who is the Chairman and General Counsel

of Freedom Watch, located in Washington, D.C. Compl. ¶2. He resided in the District of

Columbia ("D.C.") for over twenty years and is a member of the D.C. bar. He is known and

recognized in D.C., having spent the majority of his life there and remains one of the leading

lawyers in D.C. Compl. ¶2.

Defendants, however, falsely viewed Forras' lawsuit as a religious attack that attempted to impede on Defendant Rauf's ability to build the GZ Mosque and hindered Defendants' ultimate goal to drive a wedge between religious groups and ignite a religious war, while subjecting the area near Ground Zero to further attacks. In fact, Defendant Rauf's malicious mindset and motive for building the GZ Mosque became apparent during a September 8, 2010 interview with CNN's Soledad O'Brien. During the interview, Defendant Rauf threatened that preventing him from building a mosque in the Ground Zero area would cause a national security problem for the United States and new terrorism at Ground Zero because "the headlines in the Muslim world will be that Islam is under attack…(there's) the danger of the radicals in the Muslim world to our national security, to the national security of our troops." Klayman Aff. at Exhibit "2".  In the same interview, Defendant Rauf further threatened that if he does not build the mosque on Ground Zero, "it will strengthen the argument of the radicals to recruit, their ability to recruit, and their aggression and violence…" *Id.* Clearly, Defendant Rauf understood the import of his words and his true motivations became apparent: to foment a religious war between Muslims and non-Muslims.

Interestingly, Defendant Rauf repeatedly refused to respond or clarify the source of the funding for GZ Mosque. Obviously aware that Ground Zero represents a high security risk, and that the "hallowed ground" is particularly vulnerable to future terrorist attacks, Defendants have intentionally sought to build a mosque near Ground Zero that, not coincidentally, has ties with the Islamic Center of North America, a well-known terrorist organization, as well as the Muslim Brotherhood, and other terror groups. N.Y. Sup. Ct. Compl. ¶11, 16-19. In addition, Fox News also reported that a Ground Zero Mosque investor contributed to a designated terror group. *Ground Zero Mosque Investor Contributed to Designated Terror Group,* Fox News (Sept.3,

2010),www.foxnews.com/politics/2010/09/03/ground-zero-mosque-investor-contributed-designated-terror-group. Klayman Aff. at Exhibit "3".  In fact, prior to announcing the Ground Zero Mosque, Defendant Rauf revealed, and was not shy about, his support for groups linked to terror and anti-American propaganda.

Moreover, it has recently come to light that Defendant Rauf used the building of the Mosque near Ground Zero as a means to defraud donors of his non-profit organizations, which allegedly aimed to "combat anti-Muslim sentiment," of millions of dollars. Sharon Otterman, *Donor, Citing Fraud, Sues Imam Tied to Mosque Near Ground Zero*, N.Y. Times (Feb. 5, 2013), www.nytimes.com/2013/02/06/nyregion/donor-sues-imam-tied-to-mosque-near-ground-zero.html. Klayman Aff. at Exhibit "4". Instead, Rauf used the donation money for personal real estate, lavish trips, and luxury sports cars. *Id.* In addition, his organization is also accused of not reporting approximately $3 million that the Malaysian government donated to Rauf's two organizations, again the funds being used by Rauf for lavish expenses. *Id.*

Clearly, Defendant Rauf was gaining a substantial benefit in ensuring that the GZ Mosque moved forward, particularly as it allowed him to perpetuate religious hostility while allowing him the opportunity to defraud donors in order to embezzle funds and fill his own pockets with the money instead of "combating anti-Muslim sentiment." It is apparent, particularly now, that Defendant Rauf viewed Plaintiffs lawsuit as an obstruction on his ability to build the GZ Mosque and consequently, his ability to churn a profit for himself. In response to Plaintiffs' lawsuit, and as a means to force Plaintiffs to drop their lawsuit, Defendant Rauf maliciously published statements that plaintiffs' lawsuit is an attack on Islam and that Plaintiff and his counsel are enemies of Islam. Compl. ¶¶4-5, 9-10. Moreover, Defendant Rauf cynically hired what his counsel, Adam Leitman Bailey (hereafter "Bailey"), announces to the world is his

"Jewish" lawyer who then, at the direction of Defendant Rauf, attacks Plaintiff and his counsel publicly, denouncing them as "blind religious bigots" and "Nazis." Bailey Affirm. ¶¶3, 10-11.

Specifically, in Defendant Rauf's "Memorandum of Law in Support of Motion to Dismiss" (Memo) filed in *Forras v. Rauf*, Defendants falsely branded Plaintiffs as enemies of Islam, stating in pertinent part:

> "Plaintiff's attorney, an infamous publicity hound, has found in Plaintiff the perfect victim, a man who could have comfortably concluded his life as a national hero, as self-described 'first responder' to the greatest national tragedy since Pearl Harbor. Instead, thanks to this wholly frivolous lawsuit, he trades in his well deserved laurels for fifteen minutes of fame as a nationally recognized bigot." Defs.' Mem. In Supp. Of Mot. To Dismiss at 4.

> "His cause and his case have all the rationality of one who would seek to tear down New York City's Chinatown as vengeance for Pearl Harbor on the theory that all Asians are alike." *Id.* at 5.

> "Plaintiff's view is simple. According to him, Islam equates with terrorism…." *Id.*

> "Yet because of Plaintiff's revulsion for one particular religion has so poisoned his mind, he claims the right to use the power of the court…." *Id.*

> "He has elected to transform himself from America's poster child hero to America's Spokesman of Bigotry…" *Id.*

> "That the plaintiff in this suit finds Islam unacceptable to him personally is simply irrelevant to the protection which Islam is entitled under the First Amendment…" *Id.* at 8.

> "… we find that Plaintiff has nothing to offer but his bigoted assumption that all Muslims approve terrorism…" *Id.* at 25.

Defendant Rauf, through his counsel, poses a loaded question, completely unrelated to any of the legal issues, but simply another way to incite hatred and violence against Plaintiff and his counsel:

>"Does a person who suffers a morbid aversion to a particular religion have a cause of action against the construction of a house of worship….?" *Id.* at 6.

Moreover, Bailey adds insult to injury by using his Jewish heritage to attempt credibility for this radical Imam. Specifically, Bailey states, under oath no less:

>"I am an American and profoundly proud to be a citizen of the greatest most diversely embracing nation the planet earth has ever had in all of its recorded history." Bailey Affirm. at 2.

>"I am a Jew and profoundly proud to adhere to the nation that brought to Western Civilization the commands to love one's neighbor as oneself and not to oppress the foreigner for we were once strangers in another land." *Id.* at 3.

>"I will not let the right to the free exercise of religion be confined by narrowness of vision and I will not let the right to erect a house of prayer to be torn down by blind bigotry." *Id.* at 10.

>"When in the days following an analogous atrocity in 1941 our people marshaled their will and marched off, nobody was an American of this type. ***We were all united under a single banner pledged to eradicate the very kind of religious intolerance we see in Plaintiff, represented in those years by the Third Reich and those aligned with it.***" (Emphasis added). *Id.* at 11.

Defendants subsequently publicized these irrelevant and despicable statements made in the court pleadings for wide public circulation, including its wide dissemination to the Islam world and in Washington D.C. Compl. ¶ 4-5. To increase the circulation of these dangerous statements, Defendants intentionally provided the court pleadings to the New York Post, which at all material times was a print and internet newspaper with national and international publication and viewership, including wide distribution in Washington, D.C.  Compl. ¶¶ 4, 6. Thus, Defendants statements were widely circulated in Washington, D.C., particularly as the New York Post maintains a high level of viewership in D.C., since it often address matters germane to the U.S. government, Compl. ¶ 6. In fact, on October 12, 2010, The New York Post

published Defendants' false statements in its print and internet editions in an article entitled *Anti-Mosque Lawsuit Slammed as Bigotry*, which quoted Defendants' comments that Plaintiffs are "blind religious bigots." Compl. ¶¶ 8,11.

This republication of Defendants' false statements, particularly in D.C. is exactly what Defendants wanted, since D.C. is where the publication would be most likely harm Plaintiffs. Compl. ¶¶ 6, 8, 14. Defendants are fully aware that Klayman at all material times has conducted business in D.C. as the Chairman and General counsel of Freedom Watch, is a member of the D.C. bar, and is widely recognized in D.C., having spent the majority of his adult life there. Compl. ¶ 2. Unfortunately, Defendants' malicious statements are ongoing and continuous and remain accessible on the internet and through re-publications and are highly accessible to residents of D.C. Compl. ¶14.

Defendants obviously intended to harm Plaintiff and his counsel not only in court, but to incite violence against them by radical Muslims as coercion to force them to drop the lawsuit. Compl. ¶14. Plaintiffs, who are both Jewish, were branded publicly by Defendant Rauf, a Muslim cleric, to the Muslim world as an enemy of Islam in the New York Post, through publications read by radical Muslims, many of whom reside in D.C. Compl. ¶14. This was a clearly a message to injure or kill Plaintiffs. Compl. ¶14. It is axiomatic that a Muslim clergy does not announce publicly to the Islamic world that his legal adversaries are haters of Islam without expecting Islamic radicals to take action to harm or even kill them, in effect putting a de facto Fatwah out on Forras and his counsel. Compl. ¶14. As a result, Plaintiffs commenced an action against Defendant Raul and his attorney, Adam Leitman Bailey, in the District of Columbia Superior Court on December 12, 2011 entitled *Vincent Forras & Larry Klayman v. Iman Feisal Abdul Raug & Adam Leiitman Bailey*, Civil Action No. 0008122-11 (Hon. Todd E.

Edelman, J.). Plaintiffs alleged defamation, false light, assault, and intentional infliction of emotional distress.

Subsequently, the U.S. District Court for the District of Columbia ("District Court") had issued a decision, holding that D.C. Code §16-5501, *et seq.,* the "Anti-SLAPP Act", violated the Federal Rules of Civil Procedure, and thus, was unavailable to a defamation defendant sued in federal court. In addition, the District Court had pending before it other cases addressing the applicability of the Anti-SLAPP Act. In light of the change of circumstances whereby the Anti-SLAPP Act was ruled no longer applicable in federal court, Plaintiffs, in good faith, sought to voluntary dismiss the action in the Superior Court.

As such, on February 22, 2012, Plaintiffs filed with the Clerk of the Superior Court a Notice of Voluntarily Dismissal to dismiss the action in the Superior Court. (D.C. Sup. Ct. Docket dated Feb. 22, 2012) Since unilateral notice was impermissible under D.C. Superior Court Civil Rule 41(a)(1), Plaintiffs moved for dismissal by court order under Superior Court Civil Rule 41(a)(2). (D.C. Sup. Ct. Docket dated Feb. 29, 2012) The Superior Court granted dismissal of the Superior Court action without prejudice after Plaintiffs commenced this action in federal court in the District Court for the District of Columbia on February 22, 2012. Edelman Order Granting Motion to Dismiss at 2.

## ARGUMENT

## I.   JURISDICTION IS PROPER SINCE A FEDERAL QUESTION EXISTS AND PLAINTIFFS HAVE PROPERLY INVOKED DIVERSITY JURISDICTION

Under Article III of the U.S. Constitution, Federal courts can hear "…all cases in law and equity, arising under this Constitution, [and] the laws of the United States." U.S. Const. Art. III, Sec. 2. The Supreme Court has interpreted this clause broadly, finding that it allows Federal Courts to hear any case in which there is a federal ingredient. *Osborn v. Bank of United States*,

22 U.S. 738 (1824). Pursuant to 28 U.S.C. §1331 (Federal Question), "the district courts shall have original jurisdiction of all civil actions arising under the constitution, laws, and treaties of the United States." In *Merrell Dow Pharmaceuticals, Inc. v. Thomson*, 478 U.S. 804 (1986), the court determined that federal question jurisdiction existed if a plaintiff's right to relief depended necessarily on a substantial question of federal law. In *Metal Products, Inc. v. Darue Engineering & Manufacturing*, 125 S.Ct. 2363 (2005), the court held that a case falls within federal question jurisdiction if the federal law is a necessary element of the relief.

This case, which alleges defamation among other claims, inherently involves addressing the Anti-SLAPP Act, which has recently been subjected to constitutional scrutiny and its validity is currently in a state of flux. Although held inapplicable in federal actions, the Anti-SLAPP Act has raised substantial concerns over its constitutionality and applicability, which is indisputably a federal question. Since the issue of the Anti-SLAPP Act must be determined as a necessary element for Plaintiffs' right to relief, a federal question is clearly present. Thus, this case is properly within the jurisdictional powers of this Court.

Defendants' contention regarding diversity jurisdiction is also misplaced. 28 U.S.C. §1332 provides that "the district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between – citizens of different States…." Defendants all reside in New York. Plaintiff Klayman has never resided in New York but rather, has lived in Washington D.C., is a member of the D.C. bar, and is General Counsel and Chairman for Freedom Watch, located in D.C. He continues to practice law there on an ongoing basis.

In regard to Plaintiff Forras, Defendants recognize, albeit in a small footnote with convoluted text, that Forras' address listed on the Complaint in this action is 54 Danbury Road,

Suite 1776, Ridgefield, CT 06877. In fact, the Supreme Court of New York found that Forras

does not have a bona fide residence. Moreover, while Forras was located in New York (as well

as Connecticut) at the time of the initial complaint, this is no longer true and, therefore, diversity

jurisdiction is properly invoked. See *Caterpillar, Inc. v. Lewis,* 519 U.S. 61 (1996), (where the

Supreme Court made clear that federal jurisdiction predicated on diversity of citizenship can be

sustained even if complete diversity did not exist at the time of removal to federal court, so long

as complete diversity exists at the time the district court enters judgment.).

## II.   THE COURT HAS SPECIFIC JURISDICTION OVER DEFENDANTS PURSUANT TO THE DISTRICT OF COLUMBIA'S LONG-ARM STATUTE §13-423.

The District of Columbia's Long-Arm Statute §13-423 is consistent with the reach of

personal jurisdiction permitted under the Due Process Clause of the United States. Specifically,

§13-423, states, in pertinent part:

> (a) A District of Columbia court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a claim for relief arising from the person's-
>
> (1) transacting any business in the District of Columbia;
>
>      \*          \*          \*
>
> (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;
>
> (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.
>
> (b) When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him.

In analyzing §13-423, it is evident that Plaintiffs' claims arise from Defendants tortious

conduct under §13-423(a)(1), §13-423(a)(3), and §13-423(a)(4), and thus, the Court has specific

jurisdiction over Defendants.

### (1) The Court has Personal Jurisdiction Under §13-423(a)(1)

Under §13-423(a)(1), a District of Columbia court may exercise personal jurisdiction over a person when the claim for relief arises from the person's transacting any business in the District of Columbia. However, the jurisdiction must satisfy the requirements of due process. *GTE New Media Servs., Inc. v. BellSouth Corp.,* 199 F.3d 1343, 1347 (D.C. Cir. 2000). The due process analysis turns on whether a defendant's minimum contacts with D.C. establish that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The minimum contacts must arise from "some acts by which the defendants purposefully avails himself of the privilege of conducting activities with the forum state, thus invoking the benefits and protections of its laws." *Asahi Metal Indus. Co., Ltd. v. Super. Ct. of Cal.*, 480 U.S. 102, 109 (1988).

Under §13-423(a)(1), "…a defendant need not ever be physically present in the District to 'transact business' within the meaning of the statute." *Material Supply International v. Sunmatch Industrial Co*., 62 F.Supp. 2d 13, 19 (D.D.C. 1999). Moreover, in order to demonstrate that a party "transacted business" within the meaning of the statute, the party must be "purposefully engaged in some type of activity directed at district residents."*Etchebarne-Bourdin*, 982 A.2d 752, 759 (D.C. 2009). It is evident that Plaintiff's claim for relief arises from Defendants' business transactions conducted in D.C., particularly since Defendants' activity was directed at a D.C. resident and, in fact, reached and affected said resident.

Defendants widely published their defamatory statements and provided the court papers with the defamatory statements to the New York Post, which was at all material times a print and internet newspaper with national and international publication and wide distribution and viewership in Washington, D.C. Specifically, at the time Defendants publicly attacked Plaintiffs,

13

denouncing them as "blind, religious bigots" and "Nazis," and branding Plaintiffs as "enemies of Islam," Defendants were fully aware that Plaintiff Klayman had lived in D.C., worked in D.C. and was highly recognizable in D.C. Similarly, Forras also was involved in many activities in D.C. as a result of his organization. As such, Defendants intended to reach the public in D.C., particularly the many Muslims residing in D.C, knowing that Plaintiffs would be subject to attacks incited by the defamatory statements by those in D.C. Thus, Defendants' conduct was directed at residents of D.C. and constituted "transaction business" within the jurisdiction.

Lastly, as the court in *Etchebarne-Bourdin*, 982 A.2d at 763 stated, in a defamation action, the injury is deemed to occur where the defamed person is located. As such, Plaintiffs claims clearly arise from Defendants malicious publication in D.C., where Klayman works and resides, and the resulting injuries occurred in D.C. Thus, this Court has personal jurisdiction over the Defendants.

### (2) The Court has Personal Jurisdiction Under §13-423(a)(3)

§13-423(a)(3) provides this Court with personal jurisdiction as to a claim for relief arising from the person's causing tortious injury in D.C. by an act or omission in D.C. As discussed above, the defamatory statements were widely disseminated and were published in the New York Post, and widely circulated in D.C. This was indisputably widely distributed in D.C., with extensive viewership. Moreover, Plaintiff Klayman conducts his business as a leading lawyer and as the general counsel of Freedom Watch in D.C. and, his injuries occurred within D.C. As such, the tortious conduct took place in D.C. through the circulation of the defamatory statements in The New York Post and Plaintiff suffered injury in D.C. by Defendants' tortious act.

### (3)  The Court has Personal Jurisdiction Under §13-423(a)(4)

§13-423(a)(4) provides that this Court may exercise personal jurisdiction over a person as to a claim for relief arising from the person's causing tortious injury in D.C. by an act or omission outside D.C. if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in the District of Columbia. A defendant's contacts need not be great to satisfy D.C.'s Long-Arm Statute giving rise to personal jurisdiction for tortious injury caused by acts or omissions outside D.C. when the defendant engages in a persistent course of conduct. *Lewy v. Southern Poverty Law Center, Inc.*, 723 F. Supp. 2d 116, 124 (D.D.C. 2010). In addition, "persistent course of conduct" is satisfied by connections considerably less substantial than those it takes to establish general all purpose 'doing business' or 'presence' – based jurisdiction. *Lewy*, 723 F. Supp.2d at 123. Moreover, the "persistent course of conduct" required by subsection (a)(4) need not be related to the underlying claim. *Etchebarne-Bourdin*, 982 A.2d at 763. See also *Lewy*, 723 F.Supp.2d at 127.

Defendants have engaged in a "persistent course of conduct," particularly as their publication of defamatory statements is continuing and ongoing. Specifically, the New York Post article is still accessible to any D.C. resident online and other publications have undoubtedly further reiterated Defendants' malicious statements. Indisputably, Defendants' statements are consistently and continuously published and viewed in D.C. particularly since they relate to political and national concerns germane to D.C.

It is irrelevant that this matter involves a mosque in New York or that Defendants' defamatory statements were made in New York. What is relevant, however, is that Plaintiff's injury occurred within D.C. and Defendants' source of information and subject of the defamatory

article were found in D.C. See *Lewy*, 723 F.Supp.2d at 127, (holding that distribution of magazines to the District of Columbia residents was conduct "in the District" for purposes of analyzing personal jurisdiction. The court held there was personal jurisdiction in a defamation case even though the defamatory act occurred outside the district). See also *Etchebarne-Bourndin*, (holding that the court had personal jurisdiction over doctors who practiced outside of the District of Columbia for patient's claims for injuries suffered in D.C. as a result of the doctors' acts outside the District).

Defendants derived a substantial benefit as a result of their false and defamatory remarks against Plaintiffs in D.C. Defendants clearly accomplished their goal of ensuring that their defamatory statements reached a wide number of people, undoubtedly influencing many readers, and ultimately harming and endangering Plaintiffs. As such, this Court has personal jurisdiction over Defendants pursuant to §13-423(a)(4).

### III.    PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED BY THE STATUTE OF LIMITATIONS

Defendants claims are not time barred by the statute of limitations. The false statements at issue were made on or around December 12, 2010. Plaintiffs filed an action in the D.C. Superior Court on October 12, 2011 for defamation, false light, assault, and intentional infliction of emotional distress arising from Defendants' malicious statements, which is in satisfaction of Defendants' alleged one-year statute of limitations. While the Superior Court action was still pending, Plaintiffs filed their complaint in the District Court for the District of Columbia on February 21, 2012. Plaintiffs subsequently dismissed the Superior Court action after the case in federal court had commenced and, as such, there was no gab between the two cases.

Under the relation-back doctrine, the statute of limitations on Plaintiffs' claims have not

run and Plaintiffs are not barred from bringing this action against Defendants, especially since the initial complaint was filed within a year of Defendants' tortious conduct. The complaint filed in federal court was identical to the initial complaint filed in the Superior Court on October 12, 2011, and the factual situation upon which the federal court action depends remains the same and has been brought to Defendants' attention. See *Wagner v. Georgetown University Medical Center*, 786 A.2d 546 (D.C. 2001), (holding that the fact that an amendment changes the legal theory on which the action initially was brought is of no consequence if the factual situation upon which the action depends remains the same and has been brought to defendants' attention by the original pleading). The central inquiry in determining whether the new complaint relates back to the original complaint is to determine whether the adverse party, viewed as a reasonable prudent person, ought to have been able to anticipate or should have expected that the character of the originally pleaded claim might be altered or that other aspects of the conduct, transaction, or occurrence set forth in the original pleading might be called into question. *Id.*

Defendants are now trying to deprive Plaintiffs of their legal claims and punish them for dismissing the action in the Superior Court and refiling the complaint in federal court on February 21, 2012. Specifically, Defendants ignore the initial filing date of the identical complaint on December 11, 2011 and instead allege that Plaintiffs' claims are barred because of the complaint being filed on February 21, 2012. Additionally, because of the enduring nature of Defendants' statements, the threat of assault and the intentional infliction of emotional distress are persisting and thus, should not be barred.

However, it is clear that the factual situation upon which the action depends remains the same as the initial complaint. In fact, the two complaints filed by Plaintiffs are identical. The only difference is that the legal theory has changed (i.e. the Anti-SLAPP Act is not applicable in

federal court), and this is of no consequence as stated in *Wagner*. Moreover, Judge Edelman of the Superior Court stated, in addressing Plaintiffs re-filing the action in federal court and dismissing the superior court case, that "the Court cannot find, based on the record before it, that Defendant will suffer 'real and substantial detriment' from the dismissal of this action… the assertion that Plaintiffs have gained some advantage by refiling their action in federal court is thus speculative at best." (Judge Edelman Order at 4-6).

Moreover, even if the February 21, 2012 date when Plaintiffs *refile*d their complaint in federal court was used, Plaintiffs claims should not be barred pursuant to the doctrine of equitable tolling. "A court can equitably toll the statute of limitations but its power to do so will be exercised only in extraordinary and carefully circumstances." *Wiggins v. State Farm Fire and Cas. Co.*, 53 F.Supp.2d 16 (D.C. 2001). Under the doctrine of equitable estoppel, a defendant cannot rely on the statute of limitations as a defense if his conduct has lolled the plaintiff into inaction until the statute has expired. *Id.* As such, the doctrine of equitable tolling is applicable here given the delay in moving for voluntary dismissal without prejudice in the Superior Court along with exhausting all other remedies required before refiling the action in federal court. See *Owens v. District of Columbia,* 631 F.Supp. 2d 48, 57 (D.C. 2009), (finding that a former police departments employee's exhaustion of administrative remedies in connection with her defamation claims against the District and the Mayor equitably tolled the one-year statute of limitations for defamation claims until date when administrative decision became final.

Moreover, Defendants recognize that the statute of limitations for false light and intentional infliction of emotional distress are not expressly mentioned in D.C. Code 12-301(4). However, they argue that when such claims are "intertwined" with the defamation claims and that they share the one-year statute of limitations. Defendants' contention, however, is

misplaced, as the defamatory statements are not intertwined with Plaintiffs false light and intentional infliction of emotional distress claims, which arise out of the de facto Fatwah Defendants placed on Plaintiffs.

IV.    **DEFENDANTS' STATEMENTS ARE NOT PRIVILEGED SIMPLY BECAUSE OF THE EXISTENCE OF A JUDICIAL PROCEEDING**

An allegedly defamatory statement made during the course of a judicial proceeding cannot be the basis of a defamation action *so long as* the allegedly defamatory statement has some relation to the proceeding. *Mazanderan v. McGranery*, 490 A.2d 180 (D.C. 1984); *Sturtevant v. Seaboard Service System, Ltd.,* 459 A.2d 1058, 1959 (D.C. 1983). Thus, the privilege is not limitless. For the absolute immunity of the privilege to apply, two requirements must be satisfied: (1) the statement must have been made in the course of or preliminary to a judicial proceeding; and (2) the statement must be related in some way to the underlying proceeding. *Arneja v. Gildar*, 541 A.2d 621, 623 (D.C. 1988). While the absolute privilege is recognized, such special immunity is not lightly conferred, however, as it protects deliberate lies told with intent to destroy reputation. *Brown v. Collins*, 402 F.2d 209, 213 (D.C. 1968). Moreover, although the standard for "relating to the proceedings" is broad, this liberal standard is not merely satisfied by showing the defamatory comments were triggered by some pending lawsuit or the facts involved therein. *Brown v. Collins*, 402 F.2d 209, 213 (D.C. 1968). The relation of the defamatory statements to the judicial proceeding is not merely met by showing the defamatory comments were triggered by some pending lawsuits or the facts involved therein. *Brown v. Collins*, 402 F.2d 209 (D.C. 1968).

Moreover, it is well-established that offensive and abusive language by attorneys in the guise of zealous advocacy is plainly improper, unprofessional, and unacceptable [*see*, Annotation, Attorney's Verbal Abuse of Another Attorney as Basis for Disciplinary Action, 87

ALR3d 351 (1978).]  An attorney who demonstrates a lack of civility, good manners and common courtesy taints the image of the legal profession and, consequently, the legal system, which was created and designed to resolve differences and disputes in a civil manner [Matter of McAlevy, 354 A2d 289, 291 (1976).] and an attorney's conduct that projects offensive and invidious discriminatory distinctions is especially offensive. Matter of Vincenti, 114 NJ 275, 283, (1989).]; People v Fagan, 483 NYS2d 489 (1984) noting that "while the correct resolution of civil disputes is indeed an important goal of our legal system, it may fairly be said that society's primary interest in the resolution of civil disputes is that they be settled in a peaceful, orderly, and impartial manner).]

Defendants claim of privilege is a flawed for two reasons. First, Defendants' statements did not relate to the cause of action to justify the applicability of the judicial proceeding privilege. Second, Defendants' statements were so outrageous and malicious that they not only endangered Plaintiffs, but also deterred future plaintiffs from coming forward, and consequently tainted the image of the legal profession and the legal system. Defendants adamantly contend that the defamatory statements were found in "court papers," and were therefore made during a judicial proceeding. This line of reasoning is nonsensical. Simply because the court papers were created for use in a court proceeding does not inherently mean that all court documents containing defamatory statements are forever privileged if they are intentionally given to reporters for a defamatory purpose.

Rather, Defendants' false and malicious comments were unrelated to the nuisance action filed in *Forras v. Rauf*, as the *Forras v. Rauf* case did not attack Islam or the Muslim faith and causes of action pled therein did not hinge on this issue. Defendants' statements in calling Plaintiffs bigots, stating that Plaintiffs believe Islam equate with terrorist, and calling Plaintiffs

"Nazis" were absolutely unrelated to the judicial proceeding regarding a nuisance posed by the GZ Mosque. Simply because the action involved a Mosque, it does necessarily follow that Defendants' defamatory statements are related to the action just because they were regarding Islam and Muslims. Such deliberate lies, made only with the intent to endanger Plaintiffs and harm their reputation, as well as to obstruct justice, are not intended to fall under the judicial proceeding privilege and thus, Defendants are not immune under the judicial proceeding privilege.

Additionally, to call Plaintiffs, who are both of Jewish decent, "Nazis," while comparing them to the Third Reich is patently offensive and transcends any bounds of civil decency. Bailey's statements were made clearly in an attempt to discredit Plaintiff and his counsel and to prevent other Plaintiffs from coming forward in the New York action. Defendants' intent to deter potential plaintiffs is further evidenced by their statements that Plaintiffs are bigots, equate Islam with terrorism, and maintain the view that all Muslims are terrorists. To attribute such false and atrocious views to Plaintiffs was so malicious that it undoubtedly dissuaded many from coming forward regarding the nuisance posed by the GZ Mosque, particularly as such views would inevitably be attributed to them and would make them a target for attacks. To allow such false statements to be protected under the judicial proceeding privilege would essentially allow a defendant to make any defamatory remarks in court papers that arguably have some remote relationship to the action to motivate plaintiffs to forego their legal rights to avoid reputational harm. This is clearly not what was intended to result from the judicial proceeding privilege.

## V.   DEFENDANTS' STATEMENTS ARE NOT PROTECTED BY THE DISTRICT OF COLUMBIA'S ANTI-SLAPP ACT

D.C's Anti-SLAPP Act of 2010 ("Act"), requires that the party filing a special motion to dismiss under this section make a prima facie showing that the claim at issue arises from an act

in furtherance of the right of advocacy on issues of public interest. D.C. Code § 16-5502(a).[1] If

the movant makes such a showing, the motion is granted unless the responding party

demonstrates that the claim is likely to succeed on the merits. D.C. Code §16- 5502(b).

It has been recently established that the D.C. Anti-SLAPP Act is inapplicable in federal

court, particularly since the Act directly conflicts with the Federal Rules of Civil Procedure, and

requires a heightened pleading standard, prior to Plaintiff having any opportunity to conduct

discovery. Moreover, despite Defendants' contention that the Anti-SLAPP Act protects their

defamatory statements, the speech at issue does not fall within the ambits of the Act. In fact, an

application of the Anti-SLAPP Act to this case would be contrary to public policy and, even if

the Act were applicable, Plaintiffs have met their burden of showing that the claims were likely

to succeed on the merits.

### (1)   The D.C. Anti-Slapp Statute Is Inapplicable In Federal Court.

In the recent District Court decision of *3M Co. v. Boulter*, the Honorable Robert L.

Wilkins held that the Anti-SLAPP Act directly conflicted with FRCP and was thus inapplicable.

*3M Co. v. Boulter*, 842 F.Supp.2d 85, (D.D.C. 2012) (Wilkins, J.). Moreover, the court went on

to further find that it was not a substantive right, but rather a procedure that was implemented by

the Anti-SLAPP Act. In summation, Judge Wilkins determined that ultimately the "Act is a

summary dismissal *procedure* that the Defendants and the District seek to clothe in the costume

---

[1] D.C. §16-505 requires that a Special Motion to Dismiss be filed within forty-five days of the
service of the claim. On April 12, 2013, the parties filed a Joint Status Report in which the
parties advised this Court that the Superior Court action had been dismissed, and Defendants
requested that they have one month from the date of the report to file this motion. Thus,
Defendants' Special Motion to Dismiss was due on May 13, 2013.  Defendants untimely filed
their Special Motion to Dismiss on May 15, 2013 and they are now seeking to circumvent the
mandates of D.C. §16-505 claiming that they were busy trying to stay the federal court action.
This, however, does not excuse Defendants' failure to comply with the statute and Defendants
have cited no law that would justify their exception.

of the substantive right of immunity--but this is largely a masquerade." *Id.* at 100 (emphasis added).

Defendants argue that D.C.'s Anti-SLAPP Act is substantive in nature and thus, is applicable to this case. However, Defendants intentionally sidestep the majority of courts which hold Anti-SLAPP statutes to be procedural in nature and therefore, not applicable in federal court proceedings, including the recent decision by Judge Wilkin. See also *Turkowitz*, 2010 WL 5583119 at 2. See also *The Saint Consulting Grp., Inc. v. Litz*, 2010 WL 2836792 (D.Mass. July 19, 2010). Moreover, other federal courts have compared the Anti-SLAPP procedures with the Federal Rule of Civil Procedure ("FRCP") and have declined to apply the state statute when in conflict with FRCP.

Specifically, the burden-shifting required and the additional fact-finding mandated by the Anti-SLAPP Act directly conflicts with the FRCP in that it shifts the burden on the plaintiff in a manner that is at odds with the FRCP. FRCP merely requires plaintiff, at the earliest stage of litigation, to state a claim upon which relief may be granted, while the Anti-SLAPP Act "incorporates additional fact-finding beyond the facts alleged in the pleadings, which is fundamentally different from a Rule 12 motion." *South Middlesex Opportunity Council, Inc.,* 2008 WL 4595369 at 31. Simply put, the Act imposes the burden on the plaintiff to demonstrate that their claims are likely to succeed before discovery even begins. As such, the Anti-SLAPP Act is inapplicable in federal court and void in this case.

**(2)** <u>**Given the Purpose of the Anti-SLAPP Statute as well as Public Policy Concerns, the Anti-SLAPP Statute Should and Does Not Apply to this Case.**</u>

In examining the Anti-SLAPP law, it is important to evaluate the legislative intent in its enactment. SLAPP suits are often brought for "purely political purposes" in order to obtain an "economic advantage over the defendant, not to vindicate a legally cognizable right of the

plaintiff." *Blumenthal v. Drudge*, 2001 WL 587860 at 3 (D.D.C. Feb. 13, 2001), citing *Rogers v. Home Network Inc.,* 57 F.Supp.2d 973, 974 (C.D.Cal.1999). As one court pointed out, "One of the common characteristics of a SLAPP suit is its lack of merit. But lack of merit is not of concern to the plaintiff because the plaintiff does not expect to succeed in the lawsuit, only to tie up the defendant's resources for a sufficient length of time to accomplish plaintiff's underlying objective…Thus, while SLAPP suits "masquerade as ordinary lawsuits" the conceptual features which reveal them as SLAPPs are that they are generally meritless suits by large private interests to deter common citizens from exercising their political or legal right or to punish them for doing so." *Id.* citing *Wilcox v. Superior Court*, 27 Cal.App. 4th 809, 817 (1994). Certainly, this rings true here.

Moreover, in *Blumenthal v. Drudge*, the District Court held that even though the law of defamation as applied to public figures might make it difficult for the plaintiffs to ultimately prevail, the District Court cannot characterize the suit as meritless. *Blumenthal*, WL 587860, at 4. The District Court further reasoned that at this stage in the case, it could not be concluded whether the plaintiffs have not been injured in their reputations or that winning is not their primary motivation. *Id.* While a court must be sensitive to the chilling effect that a defamation suit has on exercise of First Amendment Rights, the District Court held that the defendant's exercise of his free speech rights were not chilled given his continued publication of stories in much the same manner as before the lawsuit. *Id.* As such, the District Court refused to grant defendant's Special Motion to Dismiss under the Anti-SLAPP Act. *Id.*

Through examining the legislative intent of enacting such Anti-SLAPP laws, it is evident that it this case is not the type of case that the legislatures intended to prevent. Specifically, Plaintiffs' motives are not to obtain an "economic advantage over the defendant," but rather to

vindicate a legally cognizable right. Specifically, Defendants made false statements in court papers then intentionally publicized them through the New York Post for no other purpose than to force Plaintiffs to drop their New York lawsuit by initiating a de facto Fatwah on Forras and his counsel. As such, Plaintiffs are clearly attempting to vindicate a legally cognizable right by establishing that Defendants' statements were false (i.e. Plaintiffs are not bigots nor do they equate Islam and Muslims with terrorism) and thereby mitigating the reputational harm and the danger posed to Plaintiffs' lives by Defendants' malicious and defamatory remarks.

It is important to note that Defendants made these false statements against Plaintiffs in the New York action as a result of their determination to destroy any impediment to building a Mosque near Ground Zero. As Defendant Rauf essentially threatened in his interview with CNN, any attempt to obstruct the building of the GZ Mosque would be subject to retaliation, and "the headlines in the Muslim world will be that Islam is under attack…" In fact, recently the President of the United States and the Secretary of State acknowledged that the U.S. Embassy in Benghazi was attacked and four Americans were killed simply because of a film that was released derogatorily portraying the prophet Mohammad. This is similar to the circumstances of this case and this is precisely what Defendants publicized to the Muslim world regarding Plaintiff's lawsuit in an effort to deter plaintiffs from coming forward and to force Plaintiff to drop the lawsuit, since they were now viewed as enemies of Islam and subject to attacks. There was also the real possibility that Plaintiffs could have been seriously injured or killed, thus ending the lawsuit.

Plaintiffs are legally entitled to protect their livelihood and their reputation by addressing these defamatory remarks through the judicial system. Plaintiffs are not seeking to gain any economic advantage but are simply attempting to vindicate their rights and to repair the harm

caused by Defendants' malicious statements. Clearly, it was not the legislative intent in enacting

the Anti-SLAPP Act to prevent such plaintiffs from seeking legal relief, particularly when

Defendants make such malicious statements that subject an individual to unimaginable danger.

Moreover, Defendants allege that Plaintiffs claims fall within the Act's scope as a matter

of public interest. Specifically, Defendants claim that their statements were in regard to a highly

public and debated issue, namely the construction of a mosque near Ground Zero. However, in

their vain attempt to circumvent the Act's public interest requirement, Defendants refuse to

acknowledge that the speech at issue was, in fact, not primarily focused on a public concern.

Defendants' speech did not address the debate of the nuisance posed by the GZ Mosque nor did

it address the public concern over building such a mosque, such as the indisputable increase of

threats to national security and the increase likelihood of terrorist attacks near the area. In fact,

defendants completely ignore the fact that terrorist groups provided funding for the GZ Mosque

and that Defendant Rauf has direct ties with terrorist organizations.

Instead, Defendants seize the opportunity to personally attack Plaintiffs by publishing

false statements that have absolutely nothing to do with the actual cause of action. Defendants

disregard the fact that the substance underlying Plaintiffs' causes of action do not arise from

protected activity, but a desire to harm Plaintiffs physically as well as in their reputations.

Defendants are merely attempting to use some fact "lurking in the background" (i.e. that building

the mosque near Ground Zero is a public concern) to transform Plaintiffs' meritorious claims

regarding Defendants' defamatory statements into a SLAPP suit. This type of speech does not

constitute an act of furtherance of the right of advocacy on issues of public interest. Despite

Defendants' plea to apply the Anti-SLAPP Act, and desperate attempt to misconstrue the facts, a

personal attack attributing false beliefs to Plaintiffs in a sole effort to force Plaintiffs to drop the

lawsuit is not a matter of public interest.


**VI.    EVEN IF THE ANTI-SLAPP ACT APPLIES, PLAINTIFFS ARE LIKELY TO
SUCCEED ON THE MERITS OF THEIR CLAIMS**

Given the unconstitutionality of D.C.'s Anti-SLAPP statute as well as the public policy

supporting its inapplicability, this case should not be subject to the Act. Even in the unlikely

event that the Anti-SLAPP Act does apply, Defendants' Motion to Dismiss should still be denied

since Plaintiffs can more than satisfy their burden of establishing they are likely to succeed on

the merits of their false light and defamation claims. D.C. Code §16-5502(b).

**(1) Likely to Succeed on Merits of Claim for False Light**

A claim for false light requires (1) publicity; (2) about a false statement, representation

or imputation; (3) understood to be of and concerning the plaintiff; and (4) which places the

plaintiff in a false light that would be offensive to a reasonable person. *Kitt v. Capital Concerts,

Inc.,* 742 A.2d 856, 859 (D.C. 1999), citing Restatement (Second) of Torts §652E. "It is enough

that he is given unreasonable and highly objectionable publicity that contributes to him

characteristics, conduct or belief that are false, and so is placed before the public in a false

position". Restatement (Second) of Torts §652E. Defendants fail to appreciate the varying facts

involved in Plaintiffs' false light claim, particularly given the reckless and life-threatening result

of Defendants' conduct and it is evident that Plaintiffs are likely to succeed on the merits of the

claim.

**(A) *Defendants' Broadcast Clearly Placed Plaintiffs in a False Light That Would Be
Highly Offensive to a Reasonable Person.***

A false light claim requires a false statement, representation or imputation that places

Plaintiff in a false light that would be highly offensive to a reasonable person. *Kitt,* 742 A.2d at

850. In other words, "…it applies only when the defendant knows that the plaintiff, as a

reasonable man, would be justified in the eyes of the community in feeling seriously offended

and aggrieved by the publicity." Restatement (Second) of Torts §652E, cmt. c.

Defendants maliciously attributed false beliefs to Plaintiffs, placing them in a position that

would be highly offensive to a reasonable person. Specifically, Defendants claimed that

Plaintiffs maintain that Islam is equated with terrorists, that Islam is unacceptable to Plaintiffs,

and that all Muslims approve of terrorism. Adding insult to injury, Defendants also referred to

Plaintiffs as Nazis (despite both Plaintiffs being of Jewish decent). Significantly, no such belief

was ever stated, implied or conveyed by Plaintiffs. Defendants knew, given the wide publication

of the statements, that readers and the public would not be able to appreciate Plaintiffs' actual

beliefs.

In addition, Defendants effectively placed Plaintiffs in a position of danger intending to

incite violent, atrocious, and disturbing threats towards Plaintiffs. Defendants' false, misleading,

and outrageous statements admittedly held Plaintiffs up for extreme danger in their community,

particularly in D.C., where Plaintiff Klayman is the General Counsel of Freedom Watch and is

widely recognized as a lawyer and where Plaintiff Forras is actively involved through his

organization.

### (2)   Likely to Succeed on the Merits of Claim for Defamation

"To prevail in a defamation suit, Plaintiff need show that the statements complained of

are i) defamatory; ii) capable of being proven true or false; iii) of and concerning' the Plaintiff;

iv) false; and v) made with the requisite degree of intent or fault." *Coles v. Washington Free*

*Weekly, Inc.,* 881 F.Supp.26, 30 (D.D.C. 1995), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996).

### (A) *Defendants' Statements are Defamatory.*

A statement is "defamatory" if it tends to injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the community. *Jankovic v. International Crisis Group,* 494 F.3d 1080, 1091 (D.C. 2007), citing *Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C. 1990). Generally, a publication may convey a defamatory meaning if it "tends to lower [the] plaintiff in the estimation of a substantial, respectable group, though they are a minority of the total community or plaintiff's associates." *White v. Fraternal Order of Police,* 909 F.2d 512, 518 (D.C. 2008), citing *Afro-American Publishing Co. v. Jaffe*, 366 F.2d 649, 654 (D.C.1966). If it appears that statements are at least capable of defamatory meaning, then whether they are defamatory and false are questions of fact to be resolved by the jury. *Wallace v. Skadden, Arps, Slate, Meagher, & Flom,* 715 A.2d 873, 878 (1998).

As a preliminary matter, Defendants' statements constitute ***libel per se***. To make a claim for libel per se, plaintiffs must allege that defendants statements have ascribed to plaintiffs conduct and characteristics that would tend to injury him "in [their] trade, profession, or community standing" or "adversely affect [their] fitness for the proper conduct of [their] lawful business. *Howard Univ. v. Best*, 484 A.2d 958, 988 (D.C. 1984), *Wallace v. Skadden, Arps, Slate, Meagher, and Flom*, 715 A.2d 873, 877 (D.C. 1988). Plaintiffs are not required to prove special harm if defendants words are defamation per se. *Farnum v. Colbert*, 293 A.2d 279, 281 (D.C. 1972).

Defendants spread of libelous and defamatory material about Plaintiffs have caused serious injury to their trade, profession, and community standing and have adversely affected their fitness for the proper conduct of their business. More specifically, the defamatory statements lowered Plaintiffs' reputation in their respective community and injured them in their

profession as an attorney and a founder of a charity group. Plaintiff Klayman and Forras engage in activities, personal and professional, which seek to aid peaceful Muslims. Plaintiff Forras' foundation, GearUpFoundation.org, engages in activities in this regard. Plaintiff Klayman, as a publicly known civil and individual rights activist, not only claims as friends on Facebook and in his daily life, hundreds of Muslims but also has pursued anti-discrimination legal actions on their behalf. By falsely accusing Plaintiffs as being blind religious bigots and Nazis, in addition to stating that Plaintiffs were enemies of Islam, Defendants undoubtedly lowered the credibility and reputation of Plaintiffs, particularly in their profession of advocates of peaceful relations and ensuring individual rights. Moreover, by being branded as "enemies of Islam," Plaintiffs' reputation was clearly lowered among their community, particularly among their Muslim friends, associates, and the many Muslim residents in D.C.

To further exasperate the harm to Klayman's reputation, particularly as an attorney, Bailey stated that "Plaintiff's attorney, an infamous publicity hound, has found in Plaintiff the perfect victim, a man who could have comfortably concluded his life as a national hero, as self-described 'first responder' to the greatest national tragedy since Pearl Harbor. Instead, thanks to this wholly frivolous lawsuit, he trades in his well deserved laurels for fifteen minutes of fame as a nationally recognized bigot." Bailey indisputably and falsely insinuates that Plaintiff Klayman had ulterior motives in representing Forras while maliciously stating that Forras is not a national hero but a nationally recognized bigot. This could not be further from the truth, given Forras' heroic acts during the September 11, 2001 attacks and both Klayman's and Forras' continued efforts to promote peaceful religious relations.

### (B)   *Defendants' False Statements are 'Of and Concerning' Plaintiffs and are Capable of Being Proved as True or False.*

The falsity of Defendants' statements are apparent and are clearly capable of being proven as true or false. It is true that statements of opinion that do "not contain a provable false factual connotation" are fully protected under the First Amendment. *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20 (1990); *Moldea v. New York Times Co*., 22 F.3d 310, 313 (D.C. Cir. 1994) An opinion is not actionable if it cannot be objectively verified as false or cannot "reasonably be interpreted as stating actual facts" about the plaintiff. *Milkovich*, 497 U.S. at 18-20. However, a statement of opinion may become actionable if it has an explicit or implicit factual foundation and is, therefore, objectively verifiable. *Guilford Transp. Industries, Inc. v. Wilner*, 760 A.2d 580, 596 (2000). See also, ("*Moldea* II") (statements of opinion actionable only "if they imply a provable false fact, or rely upon stated facts that are provably false"). In the case at hand, Defendants statements can objectively be verified as false, both in its explicit as well as implicit reliance in a factual foundation.

As an initial matter, Defendants argue that their comparison of Plaintiffs to the Third Reich and Plaintiffs are Nazis is merely a statement of opinion. However, it is clear that Defendants manner of analysis is a tactical effort to mislead the court from the truth: that taken into context, Defendants reference to Plaintiffs as Nazis is clearly factual and verifiable as true or false. Specifically, Defendants ignore the fact that this statement was part of a larger statement intended to support their false claim that Plaintiffs were bigots and advocated religious intolerance. Whether Plaintiffs, in fact, were bigots and advocated religious intolerance is a

factual assertion, not an opinion.[2] Such a factual assertion about someone is capable of being

verified and is understood by the public as asserting an objective fact.

Similarly, Defendants' other statements (i.e. that Plaintiffs believed Islam equated with

terrorism, that all Muslims approved of terrorism, that Plaintiffs were bigots, etc.) are clearly

false factual statements of and concerning Plaintiffs that are capable of being proven as false. In

fact, the falsity of such statements is blatantly apparent. Defendants have presented no evidence

that Plaintiffs advocated religious intolerance and discrimination. Rather, Plaintiffs involvement

in preserving individual and civil rights, particularly among Muslims, clearly discredit

Defendants' allegations and indicate their falsity. In addition, the evidence clearly supports the

finding that Defendants made the empty, false, and malicious allegations solely to force

Plaintiffs to drop their lawsuit, to make Plaintiffs the subject of potential dangerous attacks, and

to deter other Plaintiffs from coming forward.

**(C) *Defendants Have Acted with the Requisite Degree of Fault.***

Plaintiffs have alleged the requisite degree of fault. In a defamation action, plaintiffs need

only show that the defendant's fault in publishing the statement amounts to at least negligence.

*Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C. 2001). A public official seeking

---

[2] Providing further guidance is *Milkovich v. Lorain Journal Co.,* where the Supreme Court held that a reasonable fact finder could conclude the statements in a reporter's column implied assertions that a high school wrestling coach perjured himself in a judicial proceeding, and this was sufficiently factual to be susceptible of being proved as true or false. *Milkovich*, 497 at 21. The Court reasoned that it never intended to create a wholesale defamation exemption for anything that might be labeled 'opinion.' *Rodriguez v. Panayioutu*, 314 F.3d 979, 985 (9th Cir. 2001), citing *Milkovich*, 497 U.S. at 19. The Court further indicated that a false assertion of fact could be libelous even though couched in terms of opinion. *Moyer v. Amador Valley Joint Union High Sch. Dist.,* 225 Cal.App. 3d 720 (1990). "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." *Milkovich*, 497 U.S. at 19-20. As such, statements including provable false factual assertions which are implied in the context of an opinion are not protected from defamation liability under the First Amendment. See *Milkovich*, 497 U.S. at 19.

recovery of damages for a defamatory falsehood must show that the statement was made with "actual malice." *Id.* Actual malice requires that the statement was made with knowledge that it was false or with reckless disregard of whether it was false or not. *Id.*

The court in *Gertz v. Welch* pointed out that designation of the plaintiff as a public figure could rest on either of two alternative bases: whether an individual has achieved such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contests or whether an individual voluntarily injects himself in a particular controversy and thereby becomes a public figure for a limited range of issues. *Gertz v. Welch*, 418 U.S. 323, 351 (1974). In this case, the defamatory statements by Defendants that Plaintiffs are bigots and advocate religious intolerance does not thrust the Plaintiffs into a position as public officials. Defendants cannot legitimately contend that Plaintiffs are public figures through achievement of pervasive fame or notoriety. While Plaintiffs are involved in a particular controversy, specifically building of a mosque near ground zero, Defendants' defamatory statements were predominately unrelated to this matter.

Given that Plaintiffs would likely not be forced to be public figures, the requisite intent is mere negligence. Defendants were clearly – at the very least -- negligent in their publication of the defamatory article. Defendants were well aware of the falsity of their statements, trying, once exposed, to cover it up with later bogus claims of privilege. One can soundly resolve that, because of Defendants' publication and the surrounding circumstances, potential readers would accept and believe the allegations of the statements' and publications' inaccuracies without ever inquiring into the foundation for the remarks. Thus, it is clear that Defendants have acted negligently, satisfying the requirements of defamation.

Even if it were determined that Plaintiffs are public figures, the actual malice requirement is also satisfied. Actual malice requires that the statement be made with knowledge that it was

false or with reckless disregard of whether it was false or not. *Beeton,* 779 A.2d at 923.

Defendants were clearly aware of the falsity of their statement, acted with complete and reckless

disregard as to whether the statements were true and instead, continued to publish it to the

Islamic world, nationally, and internationally. Defendants perpetuated the dissemination of the

defamatory remarks, by providing court papers containing the defamatory statements to the New

York Post to publish an article with the false statements. In addition, Defendants continue to

allow these actionable statements to remain on the Internet. As a result, the requirements of

defamation are clearly met and Plaintiffs are likely to succeed on the merits of their defamation

claim. Thus, Defendants' defamatory statements are not protected by the First Amendment to the

United States Constitution.

## VII.   PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE DOCTRINE OF RES JUDICATA AND COLLATERAL ESTOPPEL

The doctrines of res judicata and collateral estoppel preclude the relitigation of the same

claim between the same parties. *Ashe v. Swenson*, 397 U.S. 436, 443-444 (1970). In determining

whether res judicata applies, the courts consider whether the claim in the first action was finally

adjudicated, whether the present claim is the same claim as raised in the prior action or which

might have been raised in the prior action; and whether the party against whom the claim is

asserted was a party or in privity with a party in the prior case. *Calomoris v. Calomoris*, 3A.3d

1186, 1190 (D.C. 2010); *Elwell v. Elwell*, 947 a.2d 1136, 1140 (D.C. 2008).

In addition to making malicious, false, and dangerous statements against Plaintiffs, as

described above, Defendants' dubious, unethical, and unscrupulous acts persisted when they

subsequently, in their deceitful tactical effort, filed for sanctions against Plaintiffs in the New

York action. In response, on January 5, 2011, Plaintiffs filed a cross motion for sanctions against

Defendants for their blatant attempt at obstructing justice. The Honorable Judge Lucy Billings held that the statements do not give rise to sanctions. Specifically, Judge Billings determined that the statements were not actionable in the narrow context of a motion for sanctions. However, it was never expressed that the statements were not actionable on a broader claim.

In response to Defendants' abhorrent and detestable statements, Plaintiffs filed a complaint alleging defamation, false light, assault, and intentional infliction of emotional distress, an action brought in the Superior Court of the District of Columbia. In particular, Plaintiffs, in the prior action, had not claimed defamation, false light, or assault. The Court never considered the claims of defamation, false light, and assault but merely limited its analysis to the context of sanctions.

Given that this case is dealing with different and new issues never examined, brought in the Superior Court of the District of Columbia, the New York State Supreme Court's ruling related to sanctions is not binding in this matter. As such, Defendants desperate attempt to avoid the consequences of their maliciously made statements is unjustifiable, as Plaintiffs claims are clearly not barred by the doctrine of res judicata and claim preclusion.

## VIII.   ATTORNEY'S FEES SHOULD NOT BE GRANTED

Defendants request attorney's fees pursuant to 28 U.S.C. §1927 and under the Anti-SLAPP Act. 28 U.S.C. §1927 states that "Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the pleadings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct.

However, this is not the situation here. Plaintiffs have brought all causes of action and claims appropriately and in good faith. Specifically, Plaintiffs voluntarily dismissed the

initial complaint in the Superior Court, given the change in the law regarding the Anti-SLAPP Act and *refile*d in good faith in federal court, before the case was dismissed without prejudice. Judge Edelman emphasized that "…the Court cannot find, based on the record before it that Defendant will suffer 'real and substantial' detriment from the dismissal of this action." Thus, Defendants have not suffered any harm by Plaintiffs bringing this action in federal court and the fact that Plaintiffs dismissed the Superior Court action and refilled in federal court is insufficient to warrant attorney's fees. See *Manion v. American Airlines, Inc.,* 395 F.3d 428, 433-34 (D.C. Cir. 2004), (district court has no authority to award fees for an appeal under 28 U.S.C. 1927).

Similarly, Defendants' request for attorney fees under the Anti-SLAPP Act also fails. D.C. Code §16-5504(a) states that a "court may award a moving party who prevails, in whole or in part, on a motion brought under §16-5502 or §16-5503 the costs of litigation, including reasonable attorney fees." However, Defendants are not entitled to recover under the Anti-SLAPP Act for several reasons. First, the Act is not applicable in federal court. Second, the Act is not applicable to this case specifically because the speech at issue did not constitute an act in furtherance of a right of public interest and to apply the Anti-SLAPP Act would contravene the legislative intent and public policy. Third, even if the Anti-SLAPP Act did apply, Plaintiffs have met their burden of showing that they are likely to succeed on the merits of their claims. It is significant to note that Plaintiffs have not had the opportunity to conduct any discovery and notwithstanding this, have clearly met the higher pleading standard under the Anti-SLAPP Act as compared to Rule 12(b)(6).

**IX.    DEFENDANTS' MOTION TO DISMISS UNDER RULE 12(b)(1), (2), (3) & (6)
        SHOULD BE DENIED**

Under Federal Rule 12(b)(6), the court must deny Defendant's motion to dismiss unless it appears to a certainty that Plaintiff would be entitled to no relief under any state of facts which could be proved to support a claim. *Banco Continental v. Curtiss National Bank of Miami Springs,* 406 F.2d 510, 514 (5th Cir.1969); *see also Gibson v. United States*, 781 F. 2d 1334, 1337 (9th Cir.  1986). In considering a motion to dismiss, all allegations of material facts alleged in the complaint must be taken as true and construed in the light most favorable to the nonmoving party. *Allman v. Phillip Morris, Inc.,* 865 F. Supp. 665, 667 (S.D.Cal.1994), citing *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989). The anti-SLAPP procedure "incorporates additional fact-finding beyond the facts alleged in the pleadings, which is fundamentally different from a Rule 12 motion." *Turkowitz*, 2010 WL 5583119 at 2. Given that Plaintiffs are likely to succeed on the merits of the claims, arguably a higher pleading standard then Rule 12(b)(6), Defendants' motion should be denied.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss the Complaint and deny Defendants' request for attorneys' fees.

Dated: June 3, 2013

Respectfully Submitted,

 /s/ *Larry Klayman*
Larry Klayman, Esq.
D.C. Bar No. 334581
Klayman Law Firm
2020 Pennsylvania Ave. NW #345
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com